May it please the Court, Your Honors. Brent Dinekenhans on behalf of Appellant Browder. Your Honors, the right of a parent to be with their children, in addition to the Fourth Amendment right to be free from unreasonable searches and seizures, is one of the most time-honored rights and traditions we have in this country. This Court should not take lightly an officer's assertion of facts which turn out to be not only exaggerated but untrue in some cases when those misrepresentations and omissions can bring about the government taking their children away. What was interesting to me about that argument, and I think you've laid out in your claim the misrepresentations about the state fines, but there's a declaration by the prosecuting attorney that indicates that she would have still filed the charges based upon the totality of the information that she had at the time. So I guess the causation is the problem here, isn't it? No, it's not, Your Honor, because one thing that she, I believe what she actually said is that she would have to go and talk to her supervisor about it, and she eventually consented. She said that... I have a quote at 6ER1122 where she says, even if there was no mention of the knives in the deputy report, I would have still determined to prosecute Ms. Browder based on the overall state of the home and the fact that Browder stated that the home was uninhabitable. So that's a direct quote from her under oath deposition, I believe. So I guess that was her statement. Well, the fact is she was presented with material misrepresentations and certain omissions. The fact that she says that it wouldn't have changed her position, that's ultimately going to be a jury issue as to the causation issue. Legally, that, of course, would not be sufficient to charge her, and I think the jury could rightfully decide that without those knives, which are actually Browder knives, and by the way, the detective testified that he only saw one instead of seeing them strewn about the house. A jury could rightfully decide that she wouldn't have actually filed the case. This is what she testified to, but the jury does not have to believe her on that question. Well, what she said was that even if it said nothing about the knife, I would have filed the charges. But the fact is that the statement was untrue about the knife. Isn't that correct? Yes, the statement was more untrue about the knife. And the state trial court dismissed the charges. Yes, based on the state of the evidence. That is correct. Which I read it. Right. Yes, so the question is, if the evidence was insufficient, can we still say that there was probable cause given the odd record here of the false statement? Right, that is the issue so far as the arrest is concerned in the first place. As far as the malicious prosecution, which I believe that's what your question is geared toward, this causation issue, she has to show a level of independence from the prosecutor. There are cases from this court that say when the prosecutor simply relies on the police officer's report and doesn't give their own independent analysis of the situation, that that can break the chain of causation right there. I'm sorry, but that can show causation right there. In other words, no immunity just because she happens to say under oath, well, even without any evidence at all, I would still charge her. That, of course, would not be a reasonable position for her to take. There wasn't any evidence at all. I looked at those pictures and the rotting food, the things that were shown around the house, and her own statement that I believe she said that the house was uninhabitable herself. I think can't the prosecutor consider those things? They can consider those things, but ultimately they have to make a legal determination. If you ask somebody if the house is uninhabitable, mind you, this is not an attorney talking in a deposition here. This is a person, a lay person, and they're in the process of moving. There's a lot of ways you can interpret the term uninhabitable outside of the legal context. It has legal meaning, you know, in the case of a charge for child endangerment, but that's not something that a prosecutor should just rely on. They would have to, you know, her admission that it was uninhabitable, the prosecutor would have to look at the pictures. She would have to look at, okay, like if she found out that the snake knives, the weapons allegedly that the child could hurt themselves with, she found out that those were actually butter knives, she found out that there's actually not any like real rotting food that poses like a serious risk of, you know, unsanitary conditions, somebody becoming infected with anything. The prosecutor would have to look at those things. They can't just, you know, rely on somebody's quote out of context outside of a legal proceeding that it's uninhabitable. Counsel, even if it was butter knives, they were in the couch, right, with two little kids. Why is that not dangerous in itself? A butter knife, there's a California Supreme Court case that says that it's not inherently dangerous. The detective court. With kids, with things that look like knives, a butter knife, I think they could do a lot of damage. You can do a lot of damage with almost anything, depending on how it's used. But it's not inherently couch. So there's two components to this, though. There's the fact that Cornett alleges that he saw them when, in fact, he admitted to trial that he only saw one. And there's also the fact that there's a dispute about whether they were actually there. And that's something that I think has gone overlooked at this point. I need to stress that. What is the fact? I thought the facts were that there was one steak knife on the table and then two butter knives in the couch. That was what was alleged at trial. Cornett admits that he could only see one. He could only recall one. That was on the counter. Yes. And then there's also the fact that Robert alleges that they were not actually there. And so the allegation here is that the alleged scene, which he was taken away from, and where the photographs were taken, was somehow tampered with. And so that's another part of it is there's a dispute about whether it was actually there. There's also a legal issue about whether that's even sufficient to constitute probable cause. Is there any evidence that the officer deliberately fabricated that evidence? Yeah, I think you can infer circumstantially. And you are allowed to use circumstantial evidence to make that infer. But just by the fact that it was not true? Or is there anything else? Well, when you characterize a butter knife as a steak knife, a steak knife is something that I think it's common knowledge can be used as a weapon. That's something people see that in movies and you see them in the kitchen. They're very sharp. They can obviously be very dangerous. A butter knife is not something. Yes, but it's just the simple fact that it was wrong, not anything else. So you take that mischaracterization, right, a misrepresentation that something that is not a weapon is a weapon, and then you take that in conjunction with the fact that he's saying that all this food is around the house. When you actually see the pictures and the house doesn't look, you know, you can maybe say that it's a little cluttered, a little messy, but it doesn't remotely resemble the sort of hazardous condition that he's portraying. You can infer. I remember looking at those pictures. I mean, there were pill bottles on the ground where children are around strewn about that place. Aside from the complete clutter and mess and, again, the rotting food, why can't the prosecutor consider that information? Well, you would have to look at the cases where they actually found these dangerous conditions. When we're talking about, you know, a messy house, in the cases that actually find it sufficient for child engagement, you're talking about cockroaches, exposed wires, weapons that have been, like handguns and things like that. You're talking about meth labs. You're talking about pit bulls that are running around without leashes. Well, I certainly don't want to create precedent that says that, you know, cluttered houses is PC for a charging of a crime here. But I guess it's my understanding what you're saying is that the house, while messy, was not sufficient for the prosecutor to make a determination that that was child engagement. No, no, it was not. But it was also not sufficient for him to arrest in the first place. And, you know, this is setting aside the fact that there is a dispute about whether those conditions actually existed at the time. But I want to get to just the legal sufficiency of them, because I feel like it's nowhere remotely close to the cases where they actually find child endangerment. Now, you asked about pill bottles. Pills, of course, depending on what they are, could potentially be dangerous. Why not cleaning fluid? Why not any small object? An infant child and just a marble or a small object, that could hurt the child as well. The fact of the matter is, when you're talking about a dangerous condition, it's got to be something that is inherently dangerous. And the cases talk about there has to be imminent harm to the child. So when you're talking, so it's not just a matter of, well, I think their house is dirty. I wouldn't keep things that way. Why don't they have their pills locked up somewhere differently? It has to be something that really poses a danger to the child, like a real danger. And, in fact, the cases talk about, you know, actual harm befalling the child. Okay, just so I'm clear on the record, they went there based on her ex's reports of forgery on the lease. Is that correct? That's correct. And it turns out that he lied. Yes, he lied repeatedly. In fact, he lied about almost everything. So she wound up being charged on the child endangerment only? Yes, only she was not charged with forgery. And there's, you know, for good reason. There was no evidence of forgery once you actually dig in to, you know, who he is and what his relationship is to her. Now, I would like to talk on that note about the warrant application. Can I ask before you get there, what was the charges dismissed? I mean, all that we have is based on the state of the evidence. Right. So what did that mean? That means, so you could not find, based on the evidence, the substantive evidence of the charge, it was insufficient to conclude beyond a reasonable doubt that she was guilty of that. So it's a sufficiency of the evidence, essentially, or a directed verdict or something like that? Yes, that's exactly what that is. I see. Okay, great. I think you wanted to reserve some time for rebuttal. You're almost at three minutes. No, Your Honor, I don't need to. I would like to address just briefly the warrant application, because we don't get to any of this if we rightfully conclude that that warrant application isn't valid. Now, the fact of the matter is Mr. Reed didn't lie. He didn't make one lie, didn't make two lies, didn't make an innocuous, you know, misrecollection or something like that. He lied about almost everything. He said he didn't know her. He said he never lived there. He said he had no connection to Victorville. And when Detective Cornett put this in his warrant application, when he omitted this from his warrant application, he knew this. So we're not talking about, in hindsight, well, he discovered later that Mr. Reed was lying about everything. He knew that he was lying about everything. He also knew that this was her ex-boyfriend. Now, the fact that it's her ex-boyfriend changes the nature of things significantly. He also put that information in the application knowing that it was false. He did not put that in the application. He put in the application. He omitted the information. Yes, but he did put in there that Reed said that he had never lived there, when he, in fact, at that time knew that Reed did live there. And he also knew that Reed had lied about these other things. And, of course, we have many cases from this court, from the Supreme Court, that talk about when you're evaluating, you need information to help evaluate. Well, he lied about not knowing her, not living there, not having any connection to Victorville. And that information was not in the application. Right. That information was not in the application. The officer knew it at the time. Yes, he did. And we have cases that say that you need information to evaluate the informant's credibility. He, as a complaining witness, is the one who's making this allegation against her that she committed forgery. Right. So the fact that he actually lived there, right, and keep in mind, his allegation, the story that he ended up with after it was found out that he actually lived there, as well, I was going to help her out with her lease, but I didn't actually live there. And, you know, I keep this, keep in mind, his original story is I have no idea who this person is. He acted like he had no connection at all. And, of course, you know, if Victor Cornett finds out that that's false, he eventually changes it to his story, which is, you know, that he was helping her out, but he didn't actually live there. Well, it turns out he did live there. And Detective Cornett had information that he lived there. So there's no excuse for not putting that into the warrant application. The magistrate would certainly want to know that if he's evaluating whether this, whether Mr. Reed is telling the truth. So by not putting it in there, you're wanting us to infer that he intentionally misled the court. Oh, certainly, certainly. Because without that information, if the magistrate knows that information, he's not going to say that Mr. Reed is credible. Remember, there's also this claim that she had consent to do it, right, which that is perfectly legal, she has consent. That's the only issue right there. If she had consent, his consent, then there's no reason to get this warrant to search her house for evidence of fraud anyway. So the fact that he lied, of course, is very material to that determination.  Thank you, Your Honors. Thank you, Counsel. Who's up first? Dave Moore for Appellees County of San Bernardino and Jeremiah Cornett. Good morning. This is a case that was correctly decided by the district court. Let's first discuss the condition of the home. Actually, first discuss his comment that there was specific omissions that were made by Cornett, and that that was an intent to essentially not be convenient with the court. Yeah. First of all, several of the claimed omissions were not alleged, although some of them were not even raised with the district court. But when you look at the claimed omissions, none of them were material to the finding of probable cause as to the forgery claim. You've got the claimed omission that, that was a complete stranger. Forge your name is different, don't you think, than someone I was living with and I knew and I dated. Forge your name. Don't you think that those two things are very different? I think they're different, but that doesn't necessarily mean there wasn't probable cause for forgery. We have spouses and significant others forging the name of the partner all the time. There are cases involving those types of facts that... Don't you think the judge would want to know that information to judge the credibility of the person that's giving them that information? Well, I would note that Deputy Cornett did put in his affidavit that Reed had co-signed on the original lease. So he put in there information, certainly from which the magistrate, the judge, could infer that Reed did in fact know Browder. But as the district court correctly noted, that doesn't change, that doesn't alter the fact that there was probable cause. Because it's not material. When you consider that alleged omission and you disregard any purported false statements, there was still probable cause. Because you had Reed saying, I signed the original lease, but not the renewal. She asked me to, but I refused. And I didn't give her consent to sign my name on the renewal. And now I'm the subject of an unlawful detainer judgment. Those core facts never changed. In fact, they're uncontroverted. Because the appellant didn't file a responsive separate statement to our statement of undisputed material facts. And Cornett looked at the two signatures and said that they were different. That's correct. You've also got the critical fact that Deputy Cornett, he didn't just rely on Reed's statements to him. He went and checked out the documents. He talked to Ms. Telles, who's the apartment complex representative, who told him that the lease renewal documents were submitted by Browder, already filled out. So the inference from that is she did the signing, she did all the filling in of the paperwork in her apartment, and then she brought them to the apartment management. She also subsequently got evicted. And that's important because it shows that she couldn't afford to live there on her own. That's why she reaches out to Reed to say, hey, can you co-sign on the renewal? Everything that Deputy Cornett knew that was material jived with the idea that there had, in fact, been a forgery. Did you say that the warrant said that he had previously co-signed, I guess, the 2015 lease? Yes. My understanding is it states in the affidavit that Browder and Reed signed the 2015 lease, or the original lease. But then did it also say that he never signed the lease for himself or anyone else? He stated that initially to Los Angeles County Sheriff's deputies before he talked to Deputy Cornett, House San Bernardino. That did not make it into the affidavit? It did not. Okay. It did not. So what should we infer from that? Again, that's not material. You shouldn't infer anything with regard to the materiality of the statement or the omission because it doesn't go to any elements of the offense of forgery. And I would cite, there's actually cases that say that omissions or misstatements, that could impact the credibility of a complaining witness. They're material only if they're critical to the finding of probable cause. And our argument is that these purported omissions and misrepresentations are not critical to a finding of probable cause. The other thing you've got to remember is two times Ms. Browder blew off meetings with Deputy Cornett. He tried to set up two different meetings with her to get her side of the story, so to speak. And she admits that on one occasion she was home, just didn't answer the door. And then she doesn't show up for the second meeting at the Victorville Sheriff's Office. She clearly had some problems. Can I ask you about the child endangerment? Sure. If it's given that the house was a mess, she said that she was moving and she had been evicted. So that's true, isn't it? She was moving, that was true, and he put that in his post-incident report. It wasn't just a mess. It wasn't just cluttered. You look at the photos and check his report out. These were appalling conditions, rotting food in the refrigerator and also in a tub in the kitchen. We have uncontroverted facts, uncontroverted. The bin on the kitchen floor was filled with trash and rotted food. Knives and other utensils found throughout the residence in areas accessible to children. Refrigerator had virtually no edible food. Boxes and bags strewn about the apartment. And Browder herself stated, this is not a habitable situation. While the officers were there. You add all that up. She said, we're not living here anymore. She said, this is not a habitable situation. She didn't say, we're not living here anymore. She said, we're moving. She didn't say that, but she also said, this is not a habitable situation. Is there any explanation for the steak knife versus butter knife discrepancy? Well, there was one steak knife. I think it's probably, if you want to call it a misstatement, I disagree with that. I think it's an exaggeration at most by Deputy Cornett. There were multiple utensils. He made a mistake by referring to steak knives when there was only one that was on the kitchen counter. There were, in fact, other types of knives on the couch where you could sit on them. Kid could take it, poke himself or his colleague in the eye, as you correctly pointed out, Judge Bumatat. They can be dangerous to kids. The case that the appellant is citing, the California Supreme Court case, didn't involve circumstances like we have here. So we can't say within the context of this case that the mere fact that they were butter knives, as opposed to some other type of steak knife, somehow vitiates probable cause. You have to take it in the totality of the circumstances, all of the things that Deputy Cornett saw. I stand with him.  Thank you, counsel. Good morning, Your Honors. May it please the Court, my name is John Fuji. I'm here as counsel solely for Thomas Boydston, Detective Thomas Boydston. Thomas Boydston was not, this case was correctly decided at the Thomas Boydston. The uncontroverted facts show that he was not at all involved in the forgery investigation. He was not at all involved in the search warrant affidavit. He was not at all involved in the actual arrest of Ms. Browder. He was not at all involved in the prosecution of Ms. Browder subsequently. His only involvement occurred because he was at work on the day of the incident, November 6th, 2018. And when Detective Cornett came into the office that morning, he said to the other detectives, hey, I'm going to go execute a search warrant. Who could come with me? And Boydston happened to be one of the detectives amongst several that went out to the house. So, if you look at Appellant's opening brief, if you look at Appellant's reply brief, if you look at Appellant's oral argument here today, they solely focus on actions of Cornett. So, before I get into any substantive issues, I just want to bring the issue that I raised in my appellee's brief about waiver. Appellants have basically waived all arguments against Boydston except for two, which I'll address today, which is their excessive force claim in the protective sweep and the unreasonable search of the apartment. That's basically the only two claims of all the claims that they have against Boydston. With regard to the protective sweep, yes, the detectives had their guns out as protocol, as they always do during the protective sweep of an apartment, where they don't know who's inside, who's behind closed doors, but the uncontroverted evidence shows that the guns drawn by detectives, including Boydston, lasted less than 30 seconds. And the cases cited by Appellants, like the Robinson case, which Your Honor wrote the unblocked opinion, are completely factually different. In the Robinson case, the man was an ex-law enforcement officer, I think. I think he shot a couple dogs that were killing his chickens. So the neighbor called, the officers arrived. He walks down his gravel driveway about 135 feet to the officers. He's got an unbuttoned shirt. They could tell he's completely unarmed. And they point a gun directly at his forehead. That case, one, was not a search case in a closed residence where you don't know who's in the house. It was clear in that case when he was walking down the driveway there were no other people around that they had to worry about the officers. And there's no facts that were presented by Appellants regarding pointing a gun at somebody's head, either Ms. Browder or any of her minor children, or yelling that I'm going to shoot you, which is the Thompson case that Appellants raised in their reply brief. So there's just, the court was right, the district court was right when they said there's no unreasonable force used in the protective sweep. And even if there could possibly be some Fourth Amendment violation, there's no case law in this circuit or in the U.S. Supreme Court that shows that it was clearly established law to any reasonable officer who was doing a protective sweep in conducting a search warrant of a house that they can't take out their guns. So I think that closes the door on the claim against Boydston on the protective sweep. The only other claim against Boydston is the unreasonable search claim. And there's case law that we've cited in the Supreme Court and from this circuit that a line officer as opposed to a detective, the lead detective who fills out the search warrant affidavit, can reasonably rely on the lead detective's representation that the search warrant was valid. And this is the exact situation feared. Boydston shows up to work that morning, has no knowledge of this case, what's going on. He's asked what this fellow call they take. He wants to help execute the search warrant. He goes out. He's told what the search warrant is. They're looking for paperwork regarding the forgery. He conducts a search. There is absolutely no evidence produced by appellants that he went outside the scope of the search when he was searching the apartment. So I think the case law is clear that as to Boydston, the only real claims that have been proffered by appellants, the excessive force claim on the protected suite and the unlawful search claim, fail as a matter of law based on the uncontroverted evidence. I have 30 seconds left. I would take any questions from the appellants. Thank you, Counsel. Okay. Thank you, Your Honors. Counsel, would you like one minute for rebuttal? Sure. Go ahead. Your Honor, so just talking briefly about the pointing the guns at the head, the excessive force claim, the Thompson case, which Counsel mentioned, this court said that was the outer bounds of qualified immunity. They granted qualified immunity in that case. That was a traffic stop, which the Supreme Court has said is inherently dangerous. But there's no case from this court or from the Supreme Court that says officers, when they're executing a warrant because they're doing a protected suite, as a matter of course, are allowed to pull out their guns. And as Counsel admits in his brief, he didn't have any information that anybody was armed. Now, you can't use the fact that you don't know something in order to justify, use it to pull out your gun. If that was the case, then you could pull out the gun every single time. All you just say is, I didn't know. I had no idea how many people there were. I didn't know if anybody was armed. The fact of the matter is he didn't have any facts that would justify it. And the fact is, we have not just Ms. Braddock, but we have her children there, too. Pulling out the gun is a matter, of course, not justified under these circumstances. It's excessive. Thank you, Your Honor. Thank you, Counsel. This case will be submitted.
judges: SCHROEDER, BUMATAY, MENDOZA